IRENE BARKER, APPELLANT, V. SAFEWAY CAB COMPANY,
APPELLEE.

299 N. W. 604

FILED AUGUST 1, 1941. No. 31117.

*Gordon Diesing,* for appellant.

*Gross & Crawford, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, CARTER and
MESSMORE, JJ.

EBERLY, J.

In this action plaintiff set forth in her petition: "That
on or about May 22, 1938, at about 6:00 p. m., plaintiff
was a passenger for hire, riding in a Safeway cab, license
1-50511, and driven by Frank Hendrix. That defendant
was driving said cab north on highway No. 73, down-hill
and following several other cars; that as said defendant
drove to the left side of said highway to pass around the
car preceding him, the driver of the car in front also pulled
to the left of the highway to pass around a car preceding
him; that said defendant drove into the left rear of the
car in front of him, which was driven by A. E. Nelson,
and causing plaintiff to suffer severe bodily injuries as
hereinafter more particularly set forth." Following this,
plaintiff's petition set forth six specifications of negligence,
including the charge that said cab driver was driving down-
hill at a speed of approximately 40 miles an hour. De-
fendant's answer, in effect, denies that the driver of the
taxicab was guilty of any carelessness or negligence in
the premises contributing to or proximately causing any
injuries to plaintiff; "and that the injury, if any received
by the plaintiff, was due to her own contributory negli-
gence." At the conclusion of the plaintiff's evidence the

trial court sustained defendant's motion for a directed verdict in its behalf and dismissed plaintiff's action. From the order of the district court overruling her motion for a new trial, plaintiff appeals.

The sole question is whether the proof presented by plaintiff establishes actionable negligence on part of defendant's driver.

The following may be said to be a summary of all the evidence: On Sunday afternoon, May 22, 1938, about 5:30 p. m., on a clear, sunny day, the highway being dry, Frank Hendrix, the cab driver, was driving north on paved highway No. 73, north of Florence, near Omaha, Nebraska. The paved portion of the highway at the place where the accident in suit occurred is about 18 feet wide, with a dirt shoulder on each side, and is a straight north and south road. Hendrix, the driver, with the plaintiff (his sister) riding in the front seat of the taxicab with him as a passenger, was trailing two other cars driving north, number one car (Hanna), number two car (Nelson). These two cars were proceeding along this highway approximately 30 miles an hour. When the cab driver got 30 to 40 feet behind the Nelson car, he blew his horn and started to pass the Nelson car. The west half of the highway was then clear and nothing was coming from the north. About the time Hendrix got to the Nelson car, Nelson suddenly got the same idea to pass the Hanna car in front of him. Without any warning horn from the Nelson car being heard in the taxicab, Nelson pulled to the left and right in front of the taxicab in which plaintiff was riding. Hendrix immediately put on his brakes, swerved to the left, but his right front fender struck Nelson's car on the left rear fender. Hendrix's car went off on the dirt on the west side of the road and the Nelson car went on down the highway. The impact of the two cars last referred to caused the injuries sustained by plaintiff, for which recovery is sought in this action.

As to the actual collision of the cars and the manner of its occurrence, Mrs. Irene Barker, the plaintiff, testified

in part as follows with reference to the driving of the taxicab by her brother, Frank Hendrix:

(On direct examination) "Q. And you had gone three or four miles north of Florence, and then do you remember whether or not you drove down a long hill? A. Yes, I do. * * * Q. And as you were going down the hill about how fast was Hendrix driving the taxicab? A. Well, I would say he was driving between 30 and 40 miles an hour. Q. And were there any other cars in front of your car? A. There were two. Q. And as you got within 40 feet of the rear of this car preceding your car, what did Mr. Hendrix do, the cab driver do? A. Why, he blew his horn and sped up to start to— Q. Did he turn any way? A. He pulled out. Q. Which way? A. To the left. Q. And as he pulled out, did the car in front of you do anything? A. Yes, sir; seemed like he had the same idea as my brother did and seemed like they both pulled out about the same time. Q. And as they both pulled out, about how far to the rear of this car in front of you was the taxicab? A. I would say about 35 or 40 feet. Q. And then as they both pulled out, what happened? A. Well, I don't know. Q. Were you knocked unconscious? A. I was."

On her cross-examination the following testimony was developed with reference to the driver of the taxicab: "Q. And as he got up to about 30 feet, you say, from the car ahead of him, he started to pass this car, didn't he? A. No, I would say about 35 to 40 feet he started to pass the car in front of him, seems like the car in front of him had the same idea to pass the one in front of him. Q. Well, when you got up about 35 or 40 feet, then, first he blew his horn, didn't he? A. Yes, sir. * * * Q. To indicate he was going to go past, I suppose? A. I suppose. Q. Well, any way, that was what he did, wasn't it? A. Yes. Q. Then he was about 35 feet behind this other car when he blew his horn and started to go around? A. Thirty-five or 40, yes. Q. And when he started to go round, Nelson got the same idea to go round in front of the car in front of him, didn't he? A. No, sir; seemed like about

the same time my brother started to go round, Nelson got the same idea. Q. *Did Nelson blow any horn?* A. *I didn't hear any.* Q. Well, Frank was about even with Nelson's rear end when Nelson pulled out, wasn't he? A. Oh, I wouldn't say so. Q. Well, that's what you all said after the accident, wasn't it? A. Well, I don't remember what I said after the accident; I was pretty sick and in bed when the statements were taken. Q. Well, now, that exhibit No. 3, that's your statement, isn't it? A. Yes, this is my signature down here. Q. Did you read this? A. I say, I suppose, I signed it. Q. Without reading it? A. I say I couldn't see. Q. Your signature seems to be in pretty good handwriting all right, doesn't it? A. Just about like I always write, I guess. Q. It says down at the bottom, 'I have read the above report, and it is true.' You didn't say that either, you think? A. It was read to me. Q. Oh, it was read to you before you signed it? A. Yes, sir. Q. Well, now, calling your attention to the third page, I will ask you if at that time you didn't state, 'We were driving towards the north down-grade on a paved highway, there were two cars ahead of us on the highway and all three of us were going quite slow, about 35 miles per hour; there is a center lane on the highway and before Frank started to pass the car he was driving to the right-hand side of this lane;' that's what you said, isn't it? * * * A. Yes, sir. Q. All right, now let's agree to this, and that's what you say now, isn't it? A. Yes, sir. Q. Next paragraph. 'As we got close to this car ahead of us, the road was clear up ahead, and Frank started to honk his horn, signaling that he was going to pass. Frank was driving at that time on the west side of the highway. Just as Frank got close to this car ahead of us, and the front end of our car got about even with the rear of the car ahead of us, this other car shot out to the west side of the highway without any warning, and he apparently wanted to pass the first car;' now, that's the way you told about it right after the accident, wasn't it? A. I don't remember putting it just that way. * * * Q. Well, that's the way

you told about it afterwards, wasn't it, before you had time to figure it out? A. I don't remember of saying it that way. Q. And then you went on and said, 'Frank applied his brakes immediately when this other driver pulled out, but it was too late, and he could not avoid striking the left rear fender of this other man's automobile.' Now, that's about the way the whole thing happened, wasn't it? A. I never knew anything about his putting on the brakes, I didn't know anything about that. * * * (Recross-examination) Q. Mrs. Barker, you remember the occasion when your deposition was taken, don't you? A. Yes, sir. Q. It was taken on March 23, 1940? A. Yes, sir. Q. And your lawyer was there with you at the time? A. Yes, sir. Q. And when the deposition was taken, there was a court reporter writing things down the same as Mrs. Finley is taking what is being said here this morning? A. Yes, sir. Q. And I asked you at that time to tell us how the accident happened, didn't I? A. Yes, sir. Q. And you were not sick that day, you didn't have any bandages on your eye that day, or anything, did you? A. No, sir. * * * Q. Or do you remember just what you did say? A. I remember the distance and I remember you asking me how the cars were passing, I remember that. Q. Well, aren't these the questions and answers when your deposition was taken on March 23: 'Q. Well, what happened at the time of the accident? A. Well, we were going down-hill and there were two cars in front of us, and my brother blew his horn and started to pass this other car, and I would say he was about 30 feet, and this other car took the same notion to pass the one in front of him, and my brother ran into him. Q. How many cars were in front of you? A. Two. Q. How far apart were the two cars, the two cars in front? A. Oh, I don't know. Q. Do you know how close the two cars were together. A. No, I don't. Q. But there were two cars ahead of you? A. Yes, sir. Q. And he came up behind the first one? A. Yes, sir. Q. And blew his horn? A. Yes, sir. Q. And started to go round that first car? A. Yes. Q. And as he started

to go round, the other car started to go round the car ahead of him? A. Yes. Q. Pulled right out in front of him, is that correct? A. It seemed like they both had the same idea at the same time. Q. You are sure that your brother blew his horn all right? A. I am sure. Q. And what did he do? A. After the accident? Q. No, after he blew his horn and started around, what did he do? A. He hit this other car.' And then a little later I asked you this question, referring to this very same accident: 'Q. You made a statement about all this after the accident, didn't you? A. Why, I just don't remember it now. Q. Did you make this statement: "As we got close to this car ahead of us, the road was clear up ahead, and Frank started honking his horn at him, and he was driving fast, and Frank was driving at that time on the west side of the highway. Just as Frank got close this car ahead of us, the front end of the other car got about even with the rear of the car ahead of us, and this other car shot out on the west side of the highway, without any warning, and he apparently went to pass the first car." That is the way it happened, was it?' By Mr. Diesing (Attorney for plaintiff): The plaintiff objects as already asked and answered. That is what she says now. * * * 'Q. Frank applied his brakes immediately when this other car pulled out, but it was too late, and he couldn't avoid striking the left rear fender of the other automobile;' and then you answered, 'Could not avoid striking that other fellow (question mark).' That's what you said when I put the question to you, wasn't it? A. I asked you that to see if that was what you meant, when you said this here. Q. Well, regardless of what you had in your mind or I had in my mind, that's what you said, wasn't it? That was your answer, wasn't it, or do you know? * * * A. I don't know what you mean, if that is supposed to be the same as my first statement? Q. No, I am asking you if that wasn't the answer you made when I took your deposition in March of this year, isn't that correct? A. Yes, sir. Q. Then the next question: 'And Frank applied his brakes

immediately when this other fellow pulled out, but it was too late, and he couldn't avoid striking the left rear fender of the other automobile?' And you answered, 'Couldn't avoid striking that other fellow?' * * * Q. (repeated) 'And Frank applied his brakes immediately when this other fellow pulled out, but it was too late, and he couldn't avoid striking the left rear fender of the other automobile.' Better look at it. (Referring deposition to witness) And then your answer: 'Couldn't avoid striking that other fellow?' * * * A. (No answer.) Q. Then the question 249: 'Any way, the cars came together that way?' And you answered 'Yes;' that's what you testified to, wasn't it, at the time your deposition was taken? A. (No answer). Q. Will you answer my question, please, so I can get it in the record? A. I don't remember what you said. Q. Well, I asked you that question and you made that answer at the time your deposition was taken? A. Well, I still don't remember saying anything about brakes. I don't remember ever saying that my brother put on his brakes, because I don't remember anything about that."

The witness James, whose evidence was originally introduced by plaintiff in the form of a deposition, testified as to how the accident happened, on cross-examination, as follows: "Q. Well, now, when you were driving north on this highway 73 there were two cars in front of you, weren't there? A. Yes, sir. Q. How far apart were the two front cars? A. Well, it looked like they was pretty close together. Oh, I would say 15, 20 feet between the two cars, something like that. Q. And then Frank turned out to the left to start to go round these two cars, didn't he? A. Yes, sir. Q. *Did he blow his horn before he started to go around them?* A. *I believe he did.* Q. These two cars in front of you were on their right side of the road? A. Yes, sir. Q. And Frank was on his right side of the road? A. Yes, sir. Q. *And when he got up behind them he blew his horn and then he started to swing to the left to pass them, didn't he?* A. *Yes, sir.* Q. And then as he swung to the left to pass them, when he was about 40 feet from the second car,

that swung right out in front of Frank, didn't it, to pass the car ahead of it? A. I don't understand. (Question read again) A. Well, when he turned out to pass this car he was about 40, 45 feet behind it, and practically at the same time, maybe just a moment afterwards, the same car—this car that he was going to pass—turned out too. Q. Now, let's go back a little. There were three cars going north on the right side? A. Yes, sir. Q. The first car, you don't know who that was? A. No, sir. Q. Then there was a second car. Do you know whose car that was? A. Yes, sir; that was a farmer. * * * Q. And then there was Frank's car, the one you were riding in? A. Yes, sir. Q. *Then when Frank got up behind Nelson's car, which was the second car, got up about 40 feet behind, he blew his horn, didn't he?* A. *Well, about 45 feet.* Q. *Well, all right, 40 to 45. He blew his horn and then he turned to the left to pass the two cars in front of him, didn't he?* A. *Yes, sir.* Q. And after he blew his horn and as he swung out to pass the Nelson car and the first car, the Nelson car swung right out in front of Frank to pass the first car, didn't he? A. Practically the same time. Q. *After Frank had blown his horn and started to swing, then the Nelson car did the same thing?* A. *Yes.* Q. And they were 40 to 45 feet apart at that time? A. Yes, sir. Q. Now, did this Nelson give any signal or blow any horn that he was going to turn out and pass the car in front of him? A. Well, I didn't see any, no. Q. And then as soon as Nelson pulled out in front of Frank to pass the car in front of him, I suppose Frank put on his brakes, didn't he? A. Well, yes. Q. And the right front part of Frank's car collided with the left side of the Nelson car? A. Left side of the rear end. * * * Q. Now, when Nelson turned out to pass the number one car, the car in front of him, he didn't give any signal that he was going to pass, did he; I mean that he was going to turn out or pass the car? A. Well, not that I know of. * * * Q. And he didn't hold out his hand or anything, that you saw? A. I didn't see a thing. Q. Do you know how many times Frank blew

his horn before he started to pass Nelson's car? A. Well, one time is all I heard. Q. A good loud horn. It was a clear day, was it? A. Yes, sir. Q. Were the windows down in your car? A. Yes, sir. Q. Sunshiny day? A. Yes, sir. Q. And the pavement was dry? A. Yes, sir. Q. Now, the skid marks that you saw, you think they were about 30 feet to 35 feet, is that right? A. Well, to my best judgment, yes. * * * Q. And they started from about the center of the highway? A. Yes, sir. Q. That is, it looked like at some point after Frank had started to pass Nelson's car, the moment he put on the brakes he put them on hard enough so that he made a mark? A. Why, I felt him jerk his car, yes. Q. Well, the first time you felt a jerk was when he put the brakes on hard, and that was after Nelson had turned out in front of him, is that correct? A. That's right. Q. Now, you were not hurt in the accident, were you? A. No, sir." (Italics ours.)

The foregoing evidence tells but one story. The occurrence of an accident is not necessarily proof of negligence. It raises no presumption of negligence. The burden of establishing actionable negligence in the transaction was, by the form of the issues in the instant case, imposed on the plaintiff. The unqualified acceptance of plaintiff's entire evidence does not justify the conclusion that actionable negligence of the driver of the taxicab has been established. On the other hand, the evidence of the plaintiff quoted, as an entirety, not only fails to establish actionable negligence on part of Hendrix, the taxicab driver, but affirmatively establishes the driver of the preceding car as the party at fault whose conduct furnishes the proximate cause of the injuries sustained. The plaintiff testifies to the taxicab approaching the two preceding cars, proceeding in the same direction; the sounding of the taxicab horn; then its turning to the left side of the highway; then the simultaneous turning from the right side of the highway of the last of the preceding cars, which caused the collision and the resulting injuries. Under the circumstances and conditions prevailing at the time and place of the accident,

the following statutory rules of the road were governing:

"(a) The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance and shall not again drive to the right of the roadway until safely clear of the overtaken vehicle. (b) Except when overtaking and passing on the right is permitted; the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle." Comp. St. Supp. 1939, sec. 39-11,102.

Obviously, after the sounding of its horn the taxicab had unquestionable right of way. "Overtaking and passing on the right" was not permissible at the time and place of this accident. It was the statutory duty of the driver of the preceding car being overtaken, when his position on the highway permitted it, to give way "on audible signal" to the right in favor of the overtaking vehicle, and it was likewise the statutory duty of the driver of the overtaken vehicle not to increase the speed of his vehicle until completely passed by the overtaking vehicle. As the result of this double violation of this statute quoted, by the Nelson car, and through no fault of the taxicab driver, an emergency was created, for which the latter was in no degree responsible, and his actions in endeavoring to escape therefrom, as mirrored in plaintiff's evidence, disclose no actionable negligence on his part.

It follows that the judgment of the district court in directing the dismissal of plaintiff's action was in all respects correct, and it is

AFFIRMED.